Back now to case number two. This is Nathan Pattee v. Kijakazi, Appeal 22-2975, and we're going to begin with oral argument from Mr. Rodman. May it please the court. My name is Jason Scott Rodman, and I represent the appellant Nathan Frank Pattee. This is an appeal of a Social Security Disability case. It is a step five case. Really, it's one argument today, and it's fairly simple. Hold on, hold on, hold on. A step five case? Yes. And so at the fifth stage of, it means it got past the first four steps, and he, well I mean first. I thought it was a listing case, a 405 listing case, and an RFC case. So it could well be a 405 listing case and an RFC case. Hold on, hold on. What do you mean could be? You submitted a brief. Correct. So to, in order for those issues to be properly adjudicated requires a medical review, is the position of the plaintiff, Your Honor. And so the, and also some of this is, so those issues are in the briefing. The way the administrative law judge decision is written up puts it as a step five case. So there's a little bit of a semantics issue. But I agree with you because this case is about the simple argument that with the new positive tilt table testing there was due medical review instead of simply the administrative law judge, you know, assessing on her own accord. But she didn't assess it on her own accord. It's clear that she relied on his own treating cardiologist in reaching her determination and that his own doctor actually saw the tilt test results and said that the medication was largely controlling any symptoms he had after the tilt test. Okay, so I would use the language from the court's Moreno decision to answer that point, which is that that argument is based on the administrative law judge's own assessment of the recent record. But it's not her own assessment. It is the specific assessment of his treating physician. It is picking and choosing that there was an exam where some... How is that picking and choosing when the treating physician, the treating cardiologist, actually saw the results of the test and made specific entries about him, his medication largely controlling the conditions after that test, and that's what the ALJ relied on. She didn't come up with something on her own. Later in the case, we saw evidence that while the medications may have helped, they did not resolve the symptoms. And... His own treating physician said the medication largely controlled his condition. Right. After that treating physician saw the results of the tilt table test. The very next day, indeed. Well, but keep in mind, the nurse practitioner, Fox, and this is in the reply brief in detail, picked out what she thought was going on with this plaintiff and began giving plaintiff the medications before the positive tilt table test. And even with those medications, the tilt table test was still positive. Which is to say, yeah, medications were not needed after that tilt table test, but that's because nurse practitioner Fox had sort of had a gut feeling, as far as the record suggests, as to what was going on. But the symptoms were not resolved. And the test that the ALJ is relying on is specifically a medium RFC, which is quite substantial and which is based on significant portions of that treatment before significant portions of that treatment. So the medical reviewers did not review big portions of that stuff, most notably the tilt table test. So, Robin, can you help me out on one thing? Sure. In your brief, in several different places, you refer to this case as an etiology case. You know what I'm talking about? Yes. Okay. Tell me what you mean by that. Okay. What do you mean that this is an etiology case? Yes, it's absolutely an etiology case. Just tell me what you mean. You've said that, but I can't figure out from your brief what it is you mean by that. Okay. I know you know this, but to articulate what I'm trying to say, etiology is the process by which doctors determine what is causing what. And so you might have many, many tests that come up negative and normal, and that doesn't thereby mean that a Social Security disability claimant doesn't really have conditions, because the next one might really illustrate an underlying problem that the others didn't get to. And so the administrative law judge decision, when you read it, it addresses big areas of different etiologies, if you will, from pulmonology narrowly to cardiology narrowly to mental health narrowly. And the tilt table test is suggestive of something deeper and underlying. And I'm not a doctor, so I'm not going to even be the person to tell you exactly what that is, but it's my position, plaintiff's position, that that was due medical review. Any further questions for me? You can reserve the rest of your time, if you wish. Thank you. Thank you, Mr. Rodman. We'll now move Ms. Payne to you. Good morning, Your Honors. May it please the Court. Lindsay Payne on behalf of the Acting Commissioner of Social Security. This case comes down to the standard of review before this Court and the burden that Mr. Patty bore before the ALJ. The ALJ's decision should be affirmed because it's supported by substantial evidence, which is not a high bar. And crucially, that inquiry should be made from the point of view of the ALJ with the information that she had available to her at the time that she rendered her decision, not based upon hindsight or documents that were developed after she rendered her decision. Now, in argument here today, Mr. Rodman doesn't seem to have focused on his theory that Mr. Patty might have postural orthostatic tachycardia syndrome or POTS. So unless the Court has questions specifically about that, I would boil the argument from Mr. Patty down to the suggestion that regardless of the diagnosis, the tilt table study itself required an additional medical source of pain. Can you just confirm one thing, though? I don't see anywhere that there was a medical diagnosis. And I think you make this point. I just want to confirm it. There's not a medical diagnosis of POTS, correct? Correct. Okay. There's no diagnosis either before or after the ALJ's decision of POTS. Now, what we do have is that Dr. Shirazi, who administered the tilt table test, and Dr. Wilson, Mr. Patty's cardiologist, agreed that the tilt table study showed neurocardiogenic syncope, in other words, that he fainted but that he does not have a cardiac or neurological defect causing that. It's essentially the medical word for fainting. At that time, Mr. Patty had been already taking medication for lightheadedness for about five months already. So contrary to what he's saying here today, there wasn't some big change either from the tilt table study or from nurse practitioner Fox when she ordered the tilt table study. Mr. Patty was first diagnosed with orthostatic hypotension, meaning that he experienced a drop in blood pressure when he stood up. That was by Dr. Ransbottom, his general practitioner, in December 2019. So that's when Dr. Ransbottom started him on this medication for his lightheadedness, the same medication that Dr. Wilson said was continuing to control Mr. Patty's symptoms at the time of and after the tilt table test. Yeah, and that seems to me to be a very important fact. Dr. Wilson saw Mr. Patty the day after the tilt table test, and he saw him aware of the results of the tilt table test, and he continued the existing medications. Absolutely. That is one of the crucial factors that aligns this case with this court's other recent cases, such as Durham, Bakke, and Ducharme that are discussed in the commissioner's brief, where Mr. Patty's own medical professionals had the opportunity to analyze the test results and to determine whether this was a change in his condition or this was not a change in his condition. Dr. Wilson, the cardiologist, determined it was not a change in his condition.  And that's what the ALJ relied on in making her determination. Absolutely, and she had other correlation in the record as well. For example, despite complaints of lightheadedness for some period of time, Mr. Patty told multiple providers that he had never actually fainted or lost consciousness or fallen down outside of the tilt table study. When he went to nurse practitioner Fox in May 2020, at the time she ordered the tilt table study, he initially told her, I fainted and I fell down the stairs. Upon further questioning by her, he acknowledged he had not lost consciousness. He had not fallen either to the ground or down the stairs. He had felt lightheaded, and he had leaned against the wall. Mr. Patty, sorry, that's at pages 1930 to 31 of the record. As we discussed at the follow-up visit with Dr. Wilson, if you look at the text of that document, record 1966 to 69, Mr. Patty's saying he's not experiencing syncope, near syncope, or falls. In February 2020, he tells Dr. Ransbottom at page 1932 of the record that he had never actually, quote unquote, passed out. So all of this evidence then corroborates what Dr. Wilson said about there not being a change in condition that was uncontrolled by his medication and lends further credence to the ALJ's decision that she could rely on that interpretation without needing additional medical opinion evidence. Isn't Dr. Lutz relevant to this too? Yes. Because after the tilt table test, he sees Dr. Lutz as well. And Dr. Lutz doesn't report any—I know that's a different discipline, right? He's a neuropsychologist? Correct. But there's nothing abnormal there either. No, and it's definitely relevant that it occurred after the tilt table study. Mr. Patty alleges, well, no one— Two days after. Yes. No one informed Dr. Lutz about the tilt table study. But Dr. Lutz was not a practitioner who was obtained by the agency to examine Mr. Patty. He was his own provider, so who other than Mr. Patty was going to inform Dr. Lutz if he thought that the tilt table study was so significant? It would have needed to be Mr. Patty. And in the formal neuropsychological testing by Dr. Lutz, he determined there was no neurological problem, which is what Mr. Patty was saying he was concerned about. There was no evidence of a hypoxic brain injury, which he continues to put forward as a theory of what could have been causing his symptoms. And instead, what Dr. Lutz determined was what Mr. Patty's providers had been saying all along, which was that he was having depression, he was having anxiety, and he was refusing to treat the cause of what he was feeling. Dr. Patty also noted that the testing showed that Mr. Patty was not making adequate effort in the testing. This wasn't just a gut feeling by Dr. Lutz. This was determined through specific measures of test validity that are designed to determine whether an impairment is causing the deficiencies in his answers or whether it was rather a lack of effort or even an attempt at symptom magnification. So, again, we have this further corroboration that supports the reasonableness of the ALJ's decision that she could safely rely on Dr. Wilson's interpretation of the tilt table study. As the ALJ noted, Mr. Patty repeatedly rejected his doctor's advice. He refused the treatment that they were offering him. He also made repeated inconsistent statements to his treatment providers, such as that he had had a cardiac arrest, a respiratory arrest, or a stroke in 2018 that caused his symptoms. All of these factors put together, reading the ALJ's decision as a whole, supports her judgment that she did not need additional opinion evidence. If there's no further questions from the court, we would ask that the court affirm the judgment below. Thank you, Ms. Payne. Mr. Rodman, we'll go back to you now for rebuttal. Thank you, Your Honors. I would draw attention to the stage case, which is cited. And that case sets out the record in a narrow instance like this one, which is here, like there. The record contains new and significant evidence that reasonably could have changed, here, the medium RFC determination of the reviewing doctors on which the ALJ relied. What do you think the RFC should have been? Well, the RFC, if the claimant were credited, and I'm talking about symptoms, I'm not talking about etiology, would likely have led to excess absences, off-task behavior, and likely at least a lighter sedentary RFC. Do you make any of those arguments in your brief that the RFC should have afforded more accommodation in X, Y, or Z form? The on-point argument in the brief is that the plaintiff should have been credited, and that the LUTs… If the RFC is deficient, don't you have to identify how it was deficient in what medical evidence supports the greater accommodation you're asking for? So, in this instance, no hypothetical was asked below a medium RFC. But were there any medical recommendations that additional limitations be included? It seemed to me the ALJ went even beyond those limitations that were recommended by the medical professionals. Okay. I didn't focus on this, but the brief below focuses on this. It's a good brief. The ALJ hasn't clarified, but this answers your point directly, which is that the ALJ hasn't clarified exactly in what way she goes beyond those articulated limitations. The burden is on you to identify what limitations should have been included but weren't. And I don't see any argument that there are limitations that were supported by a medical professional that were not included. The argument is that there is new medical evidence. That is the main and the lead argument. But there's nothing in the TILT test that says there should have been additional limitations. And no doctor has said, based on that test, there should be additional limitations. But that's true of an MRI, for example, in these stages. So, Raman, I have the same question and the same concern. Do you agree that you have not argued on appeal that the RFC is deficient in some particular way vis-a-vis accommodating your client's limitations? You have not argued that. Do you agree with that? I defer to my briefs to that. I don't think that's been the core of my argument. Well, hold on. I'm asking you about your briefs. Because the reason I'm asking you is I thought, when I went through your brief, that I was going to come to a page, because of the dizziness and the lightheadedness that your client suffers from, that you would have said, at a minimum, there has to be a sedentary limitation. And there's not. And all I'm trying to do is confirm that's not an argument you're making. That is not the core of the argument. The core of the argument is we don't know. We don't know what a medical review with the tilt table test would result in. The problem is we don't know is not an answer that suffices here, because you have to identify a legal error in the decision that you're challenging. Right? We're not going to be able to just come to a diagnosis here in the courtroom. May I finish? You may. Okay, so I'm not asking you to come to a diagnosis. In fact, I'm saying that is the doctor's realm, and this case is like the stage case where the plaintiff there disagreed with some doctor treatment. The ALJ used that against him, but there was on-point new evidence. And I thank you for your time. Thank you, Mr. Robbin. Thank you, Ms. Payne. The case will be taken under advisement.